UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK ANTONACCI,

                              Plaintiff,                          DECISION AND ORDER

                                                                  21-CV-6578DGL

                    v.

KJT GROUP, INC. and MICHAELA GASCON,

                              Defendants.

_____


        Plaintiff Mark Antonacci ("Antonacci") brings this action against his former employer, KJT

Group, Inc. ("KJT") and its President and Chief Executive Officer, Michaela Gascon ("Gascon")

(collectively "defendants"). Plaintiff alleges discrimination in employment on the basis of age and

gender, and aiding and abetting discrimination, pursuant to the New York Human Rights Law, N.Y.

Exec. Law §296(1)(a) ("NYHRL"), breach of contract, breach of the implied covenant of good faith

and fair dealing, unjust enrichment, and failure to pay wages pursuant to New York Labor Law

§109(1) ("NYLL") (Amended Complaint, Dkt. #37). The defendants have moved for summary

judgment dismissing the Amended Complaint (Dkt. #57), and Antonacci has cross moved for partial

summary judgment (Dkt. #63) with respect to his breach of contract and NYLL claims.

        For the reasons that follow, defendants' motion for summary judgment is granted in part

and denied in part, and plaintiff's cross motion for summary judgment is denied.

## FACTUAL BACKGROUND

**I.   Plaintiff's Work at KJT**

Defendant KJT is a consulting firm that provides market research and analytics to clients in the healthcare industry. Individual defendant Gascon is KJT's Chief Executive Officer ("CEO").

Plaintiff served as KJT's Executive Vice President for Commercial Operations from January 2020 until his termination in June 2021. He was interviewed, and ultimately hired for the position, by Gascon (then KJT's Chief Operating Officer) and former KJT CEO Kenneth Tomaszewski ("Tomaszewski"), pursuant to the terms of an Offer Letter dated January 2, 2020 (the "Offer Letter"), which plaintiff accepted. (Dkt. #57-3, at ¶¶5-9; Dkt. #73-1 at ¶¶5-7, 9). The Offer Letter set an annual salary of $220,000.00, and stated that in addition to his salary, plaintiff would be eligible for personal and team commissions: 0.2% if plaintiff's sales team achieved 50-99% of its monthly sales goals, and 0.5% if it achieved 100% or more. It further noted that plaintiff would be subject to periodic performance reviews, and that KJT retained the "exclusive right to determine revenue from sales and the resulting commission, and the right to amend the total sales target and commission structure annually." (Dkt. #73-1 at ¶¶9-13).

The same day the Offer Letter was sent to plaintiff, KJT drafted and signed an Executive Employment Agreement (the "Employment Agreement") for plaintiff, which stated that he would be eligible to participate in KJT's Executive Annual Bonus ("EAB") Program, the conditions and eligibility requirements for which KJT could amend at its discretion. The Employment Agreement further provided that if plaintiff was terminated without just cause prior to the end of the Employment Agreement's two-year term, he would be eligible to receive a pro rata EAB for the period worked within the calendar year, so long as he signed a general release. (Dkt. #57-3 at ¶¶7-19).

2

The Employment Agreement, which plaintiff signed approximately five days after accepting the terms of the Offer Letter, did not address the payment of individual or team commissions. On April 15, 2020, KJT issued a revised Variable Compensation Plan for its salesforce, to be effective May 1, 2020, which set forth the manner in which personal sales commissions would be calculated, and made no mention of team commissions. (Dkt. 73-1 at ¶27).

KJT contends that although sales grew during plaintiff's tenure, it was not satisfied with certain aspects of plaintiff's performance, particularly with respect to marketing, and that in or before July 2020, Gascon placed plaintiff on a 16-week improvement plan, with the goal of helping plaintiff improve his performance during the period from July 2020 through October 2020. (Dkt. #57-3 at ¶¶28-29). In late 2020, KJT decided to remove marketing responsibilities from plaintiff altogether. On or about November 23, 2020, after conversations in which both Gascon and Tomaszewski informed plaintiff they were unsatisfied with plaintiff's performance, plaintiff was provided with a performance review identifying specific areas in which KJT found his performance to be deficient. (Dkt. #57-3 at ¶¶37-45).

During 2020, company sales increased. KJT attributed the increase to "stellar performance" by certain salespersons, and not to any actions by plaintiff, while plaintiff avers that KJT's burgeoning success was due to his extraordinary efforts. In spite of the increase in sales, KJT nonetheless failed to meet its corporate financial performance goals for 2020, and although many employees received discretionary profit-sharing bonuses, no otherwise-eligible executives were paid EABs for that year. (Dkt. #57-3 at ¶¶46-49). Also in 2020, KJT began pursuing certification through the Women's Business Enterprise National Counsel ("Women's Business Certification"), which requires that companies be at least 51% woman-owned.

3

In early 2021, plaintiff received a new Variable Compensation and profit-sharing plan for that year, which outlined his compensation structure and, as with the 2020 Variable Compensation Plan, did not include team commissions. (Dkt. #57-3 at ¶¶31-35). By April 2021, KJT contends that it remained dissatisfied with plaintiff's performance and peer relationships, and decided that he would be terminated and replaced. (Dkt. #57-3 at ¶¶50-54). On June 17, 2021, plaintiff was informed that he would be terminated by KJT, "without cause," due to being a poor "cultural fit" for the company. (Dkt. #57-3 at ¶¶55-56).

Plaintiff was offered severance pay in exchange for a signed release, as set forth in the Employment Agreement, but refused to sign a release. (Dkt. #57-3 at ¶57).

KJT claims that plaintiff's termination was solely the result of dissatisfaction with his performance. Plaintiff claims that he was unfairly scrutinized and/or terminated on the basis of his gender and/or age. Plaintiff also alleges that KJT breached the terms of the Offer Letter and/or Agreement by failing to pay him team commissions and EABs.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, a common component of discrimination actions, *see Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Federal Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to

4

discrimination cases than to…other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)(summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993) (trial courts should not "treat discrimination differently from other ultimate questions of fact")).

## II.     Antonacci's Claims

### A.     Gender-Based Discrimination

Antonacci's claims of gender-based employment discrimination pursuant to the NYHRL are subject to the burden-shifting analysis articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, plaintiff must establish a prima facie case of discrimination by demonstrating: (1) membership in a protected class; (2) satisfactory job performance; and (3) an adverse employment action, occurring under (4) circumstances giving rise to an inference of discrimination. *See Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002). Once plaintiff has established a prima facie case, the burden shifts to the defendant(s) to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then returns to plaintiff, to supply evidence that the legitimate, nondiscriminatory reason offered by the defendant(s) is a pretext. *See St. Mary's Honor Center*, 509 U.S. 502 at 508.

The first and third prongs of Antonacci's prima facie case are not in dispute. Antonacci is a male, and his termination was undisputedly an adverse employment action.

As for Antonacci's performance, there are clearly disputed questions of fact. Plaintiff contends that he was an "extraordinary sales leader" who was hired during a sales decline, and that

KJT's sales doubled as a direct result of his leadership. KJT, however, argues that plaintiff's performance was so poor that KJT opted to remove all of the marketing functions from plaintiff's job within six months after hiring him, and placed him on a performance improvement plan to address additional deficiencies in his performance, particularly with respect to account review, lack of portfolio strategy insight, failure to listen to others, lack of responsiveness, and faulty record-keeping.

Regardless of whether Antonacci has established that he was performing his job satisfactorily, I find that Antonacci cannot establish a prima facie case, because he has failed to provide evidence sufficient to establish its final prong. Even viewing all facts and construing all inferences in plaintiff's favor, plaintiff cannot demonstrate that his termination occurred under circumstances suggesting gender-based discrimination.

Antonacci argues that shortly before he was terminated, KJT attempted to make itself more appealing to one if its clients by applying for Women's Business Certification, a certified status for women-owned businesses in the United States that is administered by the Women's Business Enterprise National Council. Plaintiff claims that KJT needed to place more women in leadership in order to qualify for Women's Business Certification, and that this desire led directly to the appointment of Gascon as KJT's new CEO, the appointment of two additional female executive team members, and plaintiff's own termination.

Even assuming the truth of plaintiff's allegations that KJT was determined to obtain Women's Business Certification, plaintiff has not plausibly alleged or established that his termination could have played any conceivable role in KJT's eligibility for that certification, or that it otherwise occurred under circumstances suggesting gender-based discrimination. *See DeLuca v. Allied Domecq Quick Service Restaurants*, 2006 U.S. Dist. LEXIS 39261 at *9 (E.D.N.Y. 2006)

(an employer may undertake an adverse employment action "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"); *Johnson v. New York City Board of Education*, 2000 U.S. Dist. LEXIS 17410 at *25 (E.D.N.Y. 2000) (complaint dismissed where employee alleged age and race-related discrimination, but failed to offer any evidence that the employer's activity was motivated by illegal discrimination, or involved any instance of race or age-based animosity such as a remark, gesture, or innuendo).

Plaintiff argues that because his termination was initiated two weeks after Gascon e-mailed KJT management and directed that they begin pursuing Women's Business Certification, a reasonable jury could conclude that plaintiff would not have been terminated but for KJT's desire to be more fully woman-owned.

The Court disagrees. It is undisputed that Women's Business Certification applies only to "woman-owned" and led businesses, defined as businesses with a woman CEO and at least 51% ownership by women. (Dkt. #73-1 at ¶62, ¶63). It is also undisputed that plaintiff was never the CEO of KJT, and never held any ownership interest in it, nor did his female replacement. As such, neither plaintiff's termination, nor his replacement by a woman, could have had any conceivable impact on KJT's eligibility to obtain Women's Business Certification. The fact that KJT was seeking such certification around the time plaintiff was terminated does not, therefore, present circumstances supporting an inference of gender-based discrimination.

Although plaintiff argues that, had he not been terminated, he *might* have eventually obtained an ownership interest in KJT, such bare speculation is insufficient to raise a triable issue of fact.

Plaintiff offers no other evidence in support of his conclusory allegation that his termination was motivated by gender-based discriminatory animus. Accordingly, Antonacci has failed to establish a prima facie case of discrimination, and his discrimination claims must be dismissed.

Further, even assuming *arguendo* that plaintiff established a prima facie claim of gender-based discrimination, he has failed to produce evidence to rebut KJT's legitimate, non-discriminatory reason for terminating his employment – to wit, the performance issues that were initially documented in or around July 2020 and resulted in a significant diminution of plaintiff's job responsibilities, and the introduction of a performance improvement plan.

Although plaintiff does not dispute that KJT identified performance deficiencies and removed marketing responsibilities from him, he argues that KJT's reasoning had to have been pretextual, because other employees were given suggestions for improvement in the same manner, and at the time of his termination, his "cultural" disconnect from the company was cited as the reason, rather than any specific performance issue.

Initially, KJT's description of plaintiff as being a poor "cultural fit" with the company is not inconsistent with KJT's alleged reasons for terminating plaintiff's employment. Further, to the extent that plaintiff contends that the unsatisfactory performance reviews or improvement plan cited by KJT as a reason for his termination were exaggerated or unfair, a plaintiff's subjective disagreement with an employer's assessment of their performance "is insufficient to raise a jury issue as to discrimination." *Tubo v. orange Reg'l Med. Ctr.*, 690 F. App'x 736, 738 (2d Cir. 2017). *See also Edwards v. Rochester Inst. of Tech.*, 2018 U.S. Dist. LEXIS 53326 at *53-*54 (W.D.N.Y. 2018)(disagreement with employer regarding the quality of one's work performance is, by itself, insufficient to support a finding that the employer's proffered rationale is pretextual); *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 513 (S.D.N.Y. 2012) (courts do not "sit as a

super-personnel department," and even if a plaintiff's disagreement with his employer's assessment is well-founded, it is "immaterial as long as the decision to terminate [p]laintiff was not based on discriminatory animus")(quoting *Pearson v. Merrill Lynch*, 2012 U.S. Dist. LEXIS 39456 at \*31-\*32 (S.D.N.Y. 2012)). Because plaintiff has not otherwise offered evidence in admissible form to establish a prima facie case that he was terminated under circumstances suggesting a discriminatory motive, or to demonstrate that KJT's legitimate, non-discriminatory reason for terminating his employment was pretextual, his gender-based discrimination claim must be dismissed.

      **B.**      **Age-Based Discrimination**

Antonacci also claims that his termination represented age-based discrimination, in violation of NY Exec. Law §296(1)(a), which is, in the absence of direct evidence, likewise evaluated under the *McDonnell Douglas* burden-shifting test. *See* 411 U.S. 792.

It is undisputed that Antonacci was terminated at the age of 62, and was replaced by an employee approximately twenty years his junior.

Assuming *arguendo* that Antonacci has satisfied his burden to establish a prima face case of age-based discrimination, KJT has responded with its legitimate, nondiscriminatory reason for terminating plaintiff's employment – his demonstrated performance issues, which were codified in written performance reviews and in the terms of plaintiff's performance improvement plan. As such, the burden returns to plaintiff, to present evidence in admissible form showing that KJT's legitimate non-discriminatory reasons are pretextual.

Once again, plaintiff has not met that burden. As with plaintiff's gender-based discrimination claims, to the extent that plaintiff contends that the unsatisfactory performance reviews or improvement plan cited by KJT as a reason for his termination were exaggerated or

unfair, plaintiff's disagreement with KJT's assessment of his performance does not provide a basis for a discrimination claim. *See Tubo*, 690 F. App'x 736 at 738.

Although plaintiff points out that he was the oldest member of KJT's leadership team at the time he was fired, he was also the oldest member of the team at the time he was *hired*, just one year earlier, at the age of 61. Gascon, who plaintiff alleges was the driving force behind the termination of his employment, had also interviewed him and joined in the decision to hire him, a fact which tends to undermine a finding of discriminatory animus. (Dkt. #58-3 at 62). *See Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global LLC*, 2022 U.S. App. LEXIS 18651 at *8-*9 (2d Cir. 2022)("we have repeatedly emphasized that when the firing decisionmaker is also the hiring decisionmaker, 'it is difficult to impute to him an invidious motivation that would be inconsistent with the decision to hire'")(quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 663, 560 (2d Cir. 1997)). *See also Coleman v. Prudential Relocation*, 975 F. Supp. 234, 238 (W.D.N.Y. 1997).

Because plaintiff has failed to rebut KJT's legitimate, nondiscriminatory reason for terminating his employment, his age-based discrimination claim must be dismissed.

### C.    Aiding and Abetting Discrimination

Plaintiff also alleges aiding and abetting discrimination claims under N.Y. Exec. Law §296(6). Because plaintiff has failed to establish his underlying prima facie discrimination claims, and/or to rebut the defendants' legitimate, nondiscriminatory reasons for terminating his employment, his aiding and abetting claims premised on such violations cannot stand. *See Koppar v. Orange Reg'l Med Ctr.*, 2022 U.S. Dist. LEXIS 21122 at *61 (S.D.N.Y.2022)(where there is "no underlying NYSHRL…violation, there [i]s no aiding and abetting of acts forbidden by the NYSHRL"). Those claims are accordingly dismissed.

### D.      Breach of Contract

Plaintiff alleges that KJT breached the terms of the Offer Letter and Executive Agreement.

In order to state a claim for breach of contract under New York law, plaintiff must allege: (1) the existence of an agreement between the parties; (2) performance by the plaintiff; (3) breach by the defendant(s); and (4) damages. *See Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013).

### 1.      Offer Letter: Team Commissions

Plaintiff first argues that he is entitled to the payment of team commissions beginning on and after January 2, 2020, when he received and accepted the Offer Letter. The Offer Letter (Dkt. #63-10) set forth plaintiff's work duties and obligations, vacation days and other benefits, and compensation, which included an annual salary, personal commissions dependent on plaintiff's individual sales, and team commissions dependent on the performance of the four sales representatives he was to supervise. Plaintiff would also be eligible for monthly team commissions, where "team sales achievement for everyone" was above 50% of KJT's 2020 goal, which according to the Offer Letter, was $1,125,000. (Dkt. #63-10 at 3-4).

KJT argues that the Offer Letter did not constitute a contract in and of itself, and was in any event superseded by the Employment Agreement which was drawn up and executed by KJT the same day, and executed by plaintiff five days later. The Employment Agreement repeated many of the employment terms set forth in the Offer Letter, but omitted any reference to commissions, and contained an integration clause (Dkt. #59-3).

Plaintiff argues that the Offer Letter constituted a separate, binding contract, and that the Employment Agreement's integration clause therefore did not affect his entitlement to team commissions. The integration clause specified that, "[t]his Agreement contains the entire agreement

11

between the parties *with respect to the subject matter hereof*; and this Agreement supersedes all other agreements . . . *with respect to the subject matter hereof* . . . [and] the Executive is not relying upon any promises, statements, understandings, representations or warranties other than those expressly set forth in this Agreement" (Dkt. #59-3 at 12)(emphasis added). Plaintiff asserts that because the Employment Agreement did not mention commissions at all, they were not part of the "subject matter" of the Employment Agreement, and thus, his entitlement to commissions under the Offer Letter remained intact even after the Employment Agreement was executed.

I find that material questions of fact exist as to whether the integration clause of the Employment Agreement operated to supersede the Offer Letter in light of the contemporaneous and linked nature of the two documents, whether the parties intended or believed that the Employment Agreement superseded the Offer Letter, and whether plaintiff was ultimately entitled to team commissions under the Offer Letter.

Where "two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986). *See also Gramercy Holdings I, LLC v. Matec S.R.L.*, 2023 U.S. Dist. LEXIS 160271 at *151 (S.D.N.Y. 2023)(where two documents were "executed together, they must be interpreted together"); *Danimos v. Halle*, 60 A.D.3d 576, 577 (N.Y. 1st Dep't 2009)("[i]t is a well-established rule of contract law that all contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction"). "In determining whether contracts are separable or entire, 'the primary standard is the intent manifested, viewed in the surrounding circumstances'" *Id*., 60 A.D.3d 576 at 577 (quoting *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 439 (N.Y. 2d Dep't 1981)). Here, the

Offer Letter and Employment Agreement were created by KJT on the same day, and the Offer Letter's plain language appears to contemplate that it would be *supplemented* by the Employment Agreement, rather than *supplanted* by it. The Offer Letter specifically stated that, "in addition to [your] salary, you are eligible for personal and team commissions from gross revenue sold as outlined on page 2. Upon execution of your Executive [Employment] Contract, you will *also* be eligible for an Executive Annual Bonus." (Dkt. #63-10 at 2)(emphasis added). Furthermore, it is undisputed that the Offer Letter provided for the payment of personal sales commissions to plaintiff, and that even though the Employment Agreement likewise omitted any mention of those commissions, KJT did in fact pay personal commissions to plaintiff, although the record is unclear when those commissions were paid, and if they were paid pursuant to the terms of the Offer Letter, or a subsequent compensation plan. (Dkt. #73-13 at 6-7, ¶12).

At the same time, there is evidence to suggest that the parties might not have intended for the Offer Letter's obligations relative to team commissions to survive after the execution of the Employment Agreement, and/or one or more of the various compensation plans that were introduced later: it appears undisputed that plaintiff repeatedly accepted written compensation plans in April 2020 and thereafter that did not include team commissions, and never during his 18 months of employment at KJT made any inquiry as to why no team commissions – which were supposed be paid monthly – had ever been paid to him.

This contradictory evidence raises material questions of fact as to whether the Offer Letter was superseded or extinguished by the Employment Agreement's integration clause and/or by subsequent compensation plans.

In any event, even assuming *arguendo* that plaintiff was theoretically eligible to earn team commissions as set forth in the Offer Letter for some or all of his employment with KJT, plaintiff

has thus far failed to present proof in admissible form that he did earn them. Under the terms of the Offer Letter, certain performance goals were required to be satisfied by four named salespersons in order for team commissions to be payable. While the record contains some proof with respect to KJT's overall sales earnings, it does not specify the individual or collective performance of those particular salespersons for the relevant months.

For these reasons, both defendants' motion for summary judgment dismissing plaintiff's breach of contract claim for unpaid team commissions, and plaintiff's cross motion for summary judgment granting judgment in his favor on that claim, must be denied.

## 2.    Employment Agreement: Executive Annual Bonuses

Plaintiff also alleges that KJT breached the Employment Agreement by failing to pay him an EAB in 2020, or a pro rata EAB for the portion of 2021 prior to his termination.

KJT argues that plaintiff was not entitled to EAB in 2020, because entitlement to EAB was dependent on the company meeting its business goals, which it did not do in 2020. Indeed, Gascon testified that because the 2020 business goals were not met, no eligible executives were paid an EAB at KJT for that year. (Dkt. #72-4 at 17). Although plaintiff disputes this, and argues that KJT met its sales targets in 2020, plaintiff offers no evidence to refute Gascon's testimony as to KJT's 2020 performance, or its non-payment of EABs to any executive.

To the extent that plaintiff points out that other KJT employees were paid "bonuses" for 2020 while he was not, the evidence to which he alludes is inapposite, and indicates only that those employees received discretionary profit-sharing bonuses for 2020, which were part of a different bonus program and undisputedly not EABs. *See* Dkt. #73-4 at 17-19; #73-9 at 3-5; Dkt. #73-15. Because the uncontroverted evidence establishes that KJT did not meet its corporate financial

performance goals for 2020 and that the achievement of those goals was a prerequisite for EABs, plaintiff cannot demonstrate that he was entitled to an EAB for that year.

With regard to plaintiff's claim for a pro rata 2021 EAB, the Employment Agreement explicitly made such payments contingent on signing a release, which plaintiff concedes he refused to do. (Dkt. #73-1 at ¶¶19, 20). Because it is undisputed that plaintiff refused to provide the general release that was a prerequisite to entitlement to a pro rata EAB for 2021, his claim seeking payment of a 2021 EAB must be dismissed.

### E.   Breach of the Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing has a narrow scope, and 'New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach[-]of[-]contract claim, based upon the same facts, is also pled.'" *Joshi v. Trs. of Columbia Univ. in the City of New York*, 2022 U.S. App. LEXIS 21963 at *4 (2d Cir. 2022)(quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)). Plaintiff's breach of the implied covenant of good faith and fair dealing claim, which is based upon all of the same facts as his breach of contract claims, is accordingly dismissed as redundant. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n.17 (2d Cir. 2011).

### F.   Unjust Enrichment

In New York, a plaintiff may seek unjust enrichment damages from an employer where he performed work that "exceeded the scope of his duties," such that his salary did not "constitute reasonable value for the services he provided to [his employer]." *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 405 (S.D.N.Y. 2011). *See also Prisco v. Air Indus. Grp.*, 2017 U.S. Dist. LEXIS 143348 at *18 (E.D.N.Y. 2017).

Here, plaintiff does not allege that he performed any work outside of the scope of his duties. As such, plaintiff cannot establish a claim for unjust enrichment, and that claim is dismissed.

### G.    Failure To Pay Wages: New York Labor Law §190(1)

#### 1.    Team Commissions

Plaintiff also alleges that KJT's failure to pay him team commissions violated N.Y. Labor Law §190(1).

New York Labor Law §190(1) provides that all employees are entitled to the full amount of wages they earn. It defines "wages" as "the earnings of an employee for labor services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." New York Labor Law §190(1). Discretionary bonuses, however, and payments based on factors that otherwise fall outside the scope of an employee's actual work, are not included in the definition of wages. *See Soliman v. Shark Inc.*, 2004 U.S. Dist. LEXIS 14254 at *13 (S.D.N.Y. 2004).

The same material questions of fact that bar summary judgment with respect to plaintiff's breach of contract claim for unpaid team commissions (as set forth above) apply to his claims for unpaid team commissions under New York Labor Law §190(1). Because the Court has already determined that there are material questions of fact as to whether plaintiff was eligible for the payment of team commissions, and/or whether he actually earned any, summary judgment on that claim must be denied.

#### 2.    Executive Annual Bonuses

To the extent that plaintiff claims that KJT's alleged failure to pay him EABs in 2020 or 2021 also violated N.Y. Labor Law §190(1), those claims are dismissed, as they were above when characterized as breach of contract claims, for the reasons previously stated.

16

**<u>CONCLUSION</u>**

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #57) is granted in part and denied in part, and Antonacci's cross motion for partial summary judgment (Dkt. #63) is denied.

Plaintiff's claims of age and gender-based discrimination, breach of contract based on non-payment of Executive Annual Bonuses, violation of New York Labor Law §190(1) based on non-payment of Executive Annual Bonuses, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, are dismissed, with prejudice.

Because material questions of fact prevent a grant of summary judgment to either party with respect to plaintiff's breach of contract and New York Labor Law §190(1) claims based on non-payment of team commissions, summary judgment is denied as to those claims.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        July 10, 2024.